342 F.2d 905
 PAN AMERICAN-GRACE AIRWAYS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
Master Executive Councils of Pilots of Braniff Airways, Inc., and Pan American-Grace Airways, Inc., Lufthansa German Airlines and Pan American World Airways, Inc., Intervenors.
BRANIFF AIRWAYS, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
Master Executive Councils of Pilots of Braniff Airways, Inc., and Pan American-Grace Airways, Inc., Lufthansa German Airlines and Pan American World Airways, Inc., Intervenors.
 No. 18671.
 No. 18672.
 United States Court of Appeals District of Columbia Circuit.
 Argued September 17, 1964.
 Decided October 30, 1964.
 Petitions for Rehearing en Banc Denied December 11, 1964.
 Certiorari Denied March 8, 1965.
 
 See 85 S.Ct. 941.
 Mr. Howard C. Westwood, Washington, D. C., with whom Messrs. Alfred V. J. Prather, Washington, D. C., and Alexander E. Bennett, Washington, D. C., were on the brief, for petitioner in No. 18,671.
 Mr. Frank H. Strickler, Washington, D. C., with whom Mr. B. Howell Hill, Washington, D. C., was on the brief, for petitioner in No. 18,672.
 Mr. O. D. Ozment, Associate Gen. Counsel, Litigation and Legislation, Civil Aeronautics Board, with whom Mr. William H. Orrick, Jr., Asst. Atty. Gen., Messrs. John H. Wanner, Gen. Counsel, Civil Aeronautics Board, Joseph B. Goldman, Deputy Gen. Counsel, Civil Aeronautics Board, and Lionel Kestenbaum, Atty., Dept. of Justice, were on the brief, for respondent.
 Mr. Arthur R. Schor, Atty., Civil Aeronautics Board, also entered an appearance for respondent.
 
 
 1
 Mr. G. Nathan Calkins, Jr., Washington, D. C., with whom Mrs. Amy Scupi, Washington, D. C., was on the brief, for intervenor Lufthansa German Airlines.
 
 
 2
 Mr. Hubert A. Schneider, Washington, D. C., was on the brief for intervenor Pan American World Airways, Inc.
 
 
 3
 Messrs. Edward J. Hickey, Jr., James L. Highsaw, Jr., and William G. Mahoney, Washington, D. C., were on the brief for intervenors Master Executive Councils of Pilots of Braniff Airways, Inc. and Pan American-Grace Airways, Inc.
 
 
 4
 Mr. Warren E. Baker, Washington, D. C., filed a brief on behalf of Trans World Airlines, Inc., as amicus curiae.
 
 
 5
 Mr. Joseph F. Healy, Jr., Washington, D. C., also entered an appearance for Trans World Airlines, Inc., as amicus curiae.
 
 
 6
 Mr. Joel H. Fisher, Washington, D. C., filed a brief on behalf of Seaboard World Airlines, Inc., as amicus curiae.
 
 
 7
 Mr. Stephen L. Gelband, Washington, D. C., also entered an appearance for Seaboard World Airlines, Inc., as amicus curiae.
 
 
 8
 Before FAHY, WRIGHT and McGOWAN, Circuit Judges.
 
 
 9
 FAHY, Circuit Judge.
 
 
 10
 Petitioners, Braniff Airways, Inc., and Pan American-Grace Airways, Inc., are domestic air carriers. They petition for review of an order of the Civil Aeronautics Board denying a motion by Braniff, supported by Pan American-Grace, that an application previously made to the Board by Lufthansa German Airlines, intervenor, to amend its foreign air permit be consolidated with the pending United States-Caribbean-South America Investigation, known as the South American Route Case, or that the Board defer proceedings on Lufthansa's application until decision in the Route Case.
 
 
 11
 Petitioners moved in this court for a stay of the Board's proceedings in the Lufthansa case pending our review. We granted the stay. Lufthansa moved in this court that the petitions be dismissed. We denied this motion. Thereafter several American airlines which operate in the Federal Republic of Germany, herein referred to as Germany, and points beyond, under reciprocal rights granted in a bilateral Executive Agreement between the United States and Germany, were allowed to intervene or file briefs. The Master Executive Councils of Pilots of certain airlines were also allowed to intervene.
 
 
 12
 The motion before the Board to consolidate and defer, the denial of which is sought to be reviewed, was filed by Braniff as an intervenor in the case involving Lufthansa's application pursuant to Section 402 of the Federal Aviation Act, 72 Stat. 757, 49 U.S.C. § 1372 (1958), for an extension of its Europe to New York air route to points in South and Central America, in accordance with the bilateral Executive Agreement referred to. This Agreement grants to designated German carriers rights of transit in the United States, the specific routes to be set forth in an exchange of diplomatic notes.[1] Pursuant to this procedure the Secretary of State specified points in the United States and "points in the Caribbean Sea and beyond to South America."[2] The agreement also requires the foreign carrier to qualify under the "laws and regulations normally applied" by the regulating body, the Board in this case.
 
 
 13
 The route sought by Lufthansa is essentially that involved in the Route Case. If its application were granted Lufthansa would serve substantially the same points as are presently served by petitioners, who are parties in the Route Case.
 
 
 14
 The Route Case grew out of a study by the Board staff which indicated that due to the economics of the situation, and because of foreign competition in the area, the public interest could be served more efficiently with newly designated route patterns in place of routes presently operated by the two American airlines. Moreover, the Board has tentatively decided that only one American airline should operate from the United States to the western coast of South America; this route has several applicants including petitioners. The Route Case has spawned other issues, is very complicated, and hearings in the case will not begin until January 1965.
 
 
 15
 In support of its claim of right to consolidation and deferment Braniff urges that comparative hearings are required under the Ashbacker doctrine, Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945), since, it contends, the applications of petitioners and Lufthansa are mutually exclusive as a matter of economics. In denying the motion the Board said that assuming arguendo the doctrine were applicable "to this type of situation," the requisite showing of mutual exclusivity was not made, pointing out that Lufthansa's traffic along the South American route would be sharply restricted by the terms of the bilateral Agreement. The Board also found no need to defer the Lufthansa application since it felt that public interest factors could be assessed without reference to the Route Case and because, as a matter of policy, foreign carrier applications should be expedited.
 
 
 16
 As intervenors before the Board petitioners will be able to submit evidence to the Board relating to Lufthansa's diversion of business from domestic carriers operating in the same area. But denial of a comparative hearing with Lufthansa may preclude petitioners from showing economic superiority over Lufthansa in operating the route in question.[3]
 
 
 17
 We think the petitions must be dismissed for lack of jurisdiction in this court. Our jurisdiction depends upon Section 1006 of the Act, set forth in the margin.[4] Though the action denying consolidation and postponement was by means of an order, reviewable orders do not, ordinarily, include such interlocutory or procedural orders:
 
 
 18
 "administrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process. United States v. Los Angeles & Salt Lake R. Co., 273 U.S. 299 [47 S.Ct. 413, 71 L.Ed. 651]; United States v. Illinois Central R. Co., 244 U.S. 82 [37 S.Ct. 584, 61 L.Ed. 1007]; Rochester Telephone Corporation v. United States, 307 U.S. 125, 131 [59 S.Ct. 754, 757, 83 L.Ed. 1147]."
 
 
 19
 Chicago & Southern Air Lines v. Waterman S. S. Corp., 333 U.S. 103, 113, 68 S.Ct. 431, 437, 92 L.Ed. 568 (1948).
 
 
 20
 Petitioners contend that the order denying consolidation does deny them the substantial right to an Ashbacker hearing with Lufthansa. In the conventional case deprivation of such a hearing to a party entitled thereto would have such aspects of finality as to be reviewable:
 
 
 21
 "If the effect of the order denying consolidation in the case at bar were effectually to preclude Seaboard from rights which it otherwise would have, the order would be final as to Seaboard. It follows, as it frequently does in jurisdictional cases, for example, in the WJR case,[9] that we must consider and decide a portion of the controversy on the merits in order to determine whether we do or do not have jurisdiction.
 
 
 22
 "9. WJR, The Goodwill Station, Inc., v. Federal Communications Comm., 1949, 85 U.S.App.D.C. 392, 178 F.2d 720 (on mandate of Supreme Court)."
 
 
 23
 Seaboard & Western Airlines v. C. A. B., 86 U.S.App.D.C. 9, 11, 181 F.2d 777, 779 (1949). And see Delta Air Lines, Inc. v. C. A. B., 97 U.S.App.D.C. 46, 49, 228 F.2d 17, 20 (1955); cf. West Coast Exploration Co. v. McKay, 93 U.S.App.D.C. 307, 318, 213 F.2d 582, 593 (1954).
 
 
 24
 Petitioners are not entitled to obtain review of the present order under the principle referred to, because they are not, in our view, entitled to an Ashbacker hearing with Lufthansa. Quite different considerations bear upon Lufthansa's application and those of petitioners in the Route Case. The bilateral Executive Agreement grants Germany the right to designate a carrier to operate air services to and from
 
 
 25
 the Federal Republic of Germany via intermediate points to Boston, New York and Philadelphia, and beyond to points in the Caribbean Sea and beyond to South America.[5]
 
 
 26
 The right thus claimed to be exercised on behalf of Lufthansa is reciprocal to the right under the Agreement granted to American domestic air carriers by Germany.
 
 
 27
 The manner in which the Federal Aviation Act dovetails into this situation is set forth in Sections 402 and 801. Under Section 402 a foreign air carrier may be granted a permit by the Board if it finds that the carrier is fit, willing and able properly to perform air transportation and to conform to the provisions of the Act, "and that such transportation will be in the public interest." 72 Stat. 757, 49 U.S.C. § 1372 (1958). Section 801 provides that the issuance or amendment of any permit to a foreign air carrier under Section 402 "shall be subject to the approval of the President." 72 Stat. 782, 49 U.S.C. § 1461 (1958).
 
 
 28
 From the foregoing it is seen that the obligation of the Board as an agent of the United States in connection with Lufthansa's application involves Presidential consideration of our international relations with Germany as they arise with respect both to Lufthansa and American domestic carriers operating abroad. Such considerations are not involved in the applications of petitioners, though the route sought by them and Lufthansa may be the same and the competition of each may be affected by the operations of the other.
 
 
 29
 Petitioners contend that the criteria set forth in Section 102 of "public interest," pertinent to foreign air carrier applications under Section 402, compels the Board to consider the same factors as are involved in determining the "public convenience and necessity" applicable to a domestic carrier under Section 401. But the public interest has many facets. Under Section 102 of the Act the Board may consider other criteria than those therein specifically mentioned. And Section 1102 directs the Board to act consistently with obligations assumed by the United States in bilateral Agreements. We cannot carry the use of phraseology of similar character in the two sections to the point of overcoming the fact that the public interest involved in our obligations under the bilateral Agreement cannot be equated with the public convenience and necessity referred to in Section 401.
 
 
 30
 The public interest factors to be considered in cases arising under Section 401, including the Route Case, are primarily economic. Where the public interest referred to in Section 102 is to be considered, and superiority in one or more of the public interest factors is relevant to the grant of an application, an Ashbacker hearing insures an element of fairness in choosing among mutually exclusive applications. But neither our obligations under bilateral Agreements nor the motives for concluding them are subjects for comparative hearings. In the Lufthansa case, comparative considerations, bearing primarily upon economics, would do little to dilute the public interest factor which perhaps weighs most heavily, that is, the policy and obligations of the United States set forth in the bilateral Agreements.
 
 
 31
 Under this view of the case we do not reach the issues of mutual exclusivity or of alleged absence of findings of fact to support the Board's order. We hold only that since petitioners are not entitled to an Ashbacker hearing, the order remains interlocutory and non-reviewable.
 
 
 32
 The avenue open to petitioners through their permitted intervention in the Lufthansa case before the Board cannot now be said by us to be so restricted that petitioners will be precluded from making available to the Board, and through the Board to the President, such matters affecting the public interest as will meet the requirements of due process of law.
 
 
 33
 Dismissed for lack of jurisdiction.
 
 
 
 Notes:
 
 
 [1]
 Air Transport Agreement between the Federal Republic of Germany and the United States of America, Article 2, signed July 7, 1955. 7 U.S.T. & O.I.A. 527 (1956)
 
 
 [2]
 Route Schedule made and agreed to by the Governments of Germany and the United States pursuant to Article 2 of the Air Transport Agreement. 7 U.S.T. & O.I.A. 527, 557 (1956)
 
 
 [3]
 Of course both petitioners will participate in comparative hearings in the Route Case, to which only domestic carriers are parties
 
 
 [4]
 "Sec. 1006. (a) Any order, affirmative or negative, issued by the Board or Administrator under this Act, except any order in respect of any foreign air carrier subject to the approval of the President as provided in section 801 of this Act, shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore." 72 Stat. 795 (1958), as amended by 74 Stat. 255 (1960), 75 Stat. 497 (1961), 49 U.S.C. § 1486 (1958)
 
 
 [5]
 Supra note 2
 
 
 WRIGHT, Circuit Judge (concurring):
 
 34
 I concur in the court's opinion.
 
 
 35
 These proceedings, in my judgment, are an attempt, by the carriers now enjoying the international routes in suit, to frustrate executive action by this Government with respect to its contract obligation to the West German Government. I agree that neither this court nor the Board should be a party to it. As the Secretary of State[1] suggests, to throw Lufthansa's application into the pending United States-Caribbean-South America investigation, the so-called South America Route case, would delay — probably for years — executive action implementing the agreement. It was precisely to prevent this type of embarrassment to the conduct of our foreign affairs that the Congress denied judicial appeal from Board action on international routes. 72 STAT. 795, 49 U.S.C. § 1486 (a). See Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948). What this court said in British Overseas Airways Corp. v. C. A. B., 113 U.S.App. D.C. 76, 77, 304 F.2d 952, 953 (1962), is applicable to this case: "The prohibition [against appeal] cannot be circumvented by the expedient attempted here."
 
 
 
 Notes:
 
 
 [1]
 In his letter to the Attorney General with respect to this case, the Secretary of State states, in part:
 "It is our view that any substantial delay in the processing of Lufthansa's application, whether for a period of months or years, will severely compromise our international aviation relations and will impair our ability to negotiate effective exchanges of air routes with other countries. Doubt would be cast on our reliability in complying with the obligations set forth in our bilateral agreements; the value of route grants by the United States to foreign carriers would be significantly reduced; and the operations of our carriers over routes granted by foreign countries would be subjected to dilatory or other retaliatory measures."
 
 
 McGOWAN, Circuit Judge (dissenting):
 
 36
 My respectful disagreement with the majority in this case extends both to the merits of the order in question and our jurisdiction to review it. The court, working back from its conclusion on the merits, finds that it is without jurisdiction. There are, of course, situations in the law where this must be the order of inquiry. In my view, this is not one of them. Had I agreed with my colleagues on the merits, I still would have thought the order properly before us.
 
 
 37
 The reviewability of this order depends in the first instance upon its finality, and, secondarily, upon whether the Congress has, in Section 1006(a) of the Federal Aviation Act, expressly forbidden review of the order as one "subject to the approval of the President." The majority opinion appears to me to assume finality in the conventional sense, provided that petitioners in fact have an Ashbacker right. The difference may not be too important in terms of result here, but my own thought is that finality attaches in this case because the order effectively puts an end to petitioners' opportunity to press their claim of right to an Ashbacker determination, either on the record as it stood at the time the order was entered or after the receipt by the Board in the future of evidence on the exclusivity issue. The Ashbacker claim was hardly frivolous; and, thus, the order was appropriate for review, even though petitioners might be unable to establish their Ashbacker contentions to our satisfaction.
 
 
 38
 Section 1006(a) here contributes to finality.[1] It is urged upon us that petitioners could have submitted evidence on exclusivity in the hearings to be held upon the merits of Lufthansa's application and then argued to the Board for an alteration of its procedure in the light of such evidence. But certainly one outcome of the Section 402 hearing can be an order granting the application. That order would be one clearly subject to Presidential discretion; judicial review would be out; and petitioners would presumably be left only with a strong personal conviction of the justice of their Ashbacker position. The finality of administrative orders, for purposes of amenability to judicial review, is a highly practical concept. It derives meaning only from the immediate context. In the distinctive concatenation of circumstances in which petitioners found themselves upon the entry of the order before us, I have no doubt that they could seek relief here and that we were warranted in hearing them out, even though we might ultimately disagree with what they said.
 
 
 39
 However, I do not so disagree. I take Ashbacker to mean the following: Where a licensing agency has before it at any one point in time two applicants for a grant which surrounding circumstances indicate strongly can justifiably be made only to one, it is not to go ahead and decide for the one before it hears the other. To do otherwise, said the Supreme Court, "may satisfy the strict letter of the law but certainly not its spirit or intent," and "deprives the loser of the opportunity which Congress chose to give him." These procedural limitations in the interest of fair hearing have been accepted as fully applicable by this court to applications by domestic air carriers under Section 401 of the Federal Aviation Act.[2] The question we now face is whether they also apply when the Board has before it apparently conflicting applications under Section 401 and Section 402, the latter being the provision made by Congress whereunder foreign air carriers, as distinct from United States flag lines, may seek authority to fly between the United States and foreign countries.
 
 
 40
 Although the foregoing is, I believe, an accurate formulation in general terms of the issue to be decided, it is the part of caution to bear in mind that the resolution of any Ashbacker problem cannot be divorced from the peculiar facts giving rise to it. This Court has said in Delta that Ashbacker is "a rule of substance and not * * * a mere prescription of form," noting that the Supreme Court in its initial formulation avowed its concern to be with the "practicalities" of the particular case before it. 97 U.S.App.D.C. 46, 50, 228 F.2d 17, 21 (1955). Fair hearing in the administrative area is nothing if not a fluid concept, with its contours changing from case to case in accordance with the realities confronting the parties. The central reality faced by petitioners here is the Board's view, announced in its order initiating an investigation of the Latin American route situation, that the proliferation of foreign air carriers on the route served by petitioners appeared to make it desirable for one of them to have its route extended to New York and for the other to be eliminated. It is against this backdrop that one more in a long line of foreign carriers presents itself to the Board with a Section 402 application to serve the New York-South America route. The Board schedules that application for prompt hearing and presumably prompt disposition. It tells petitioners that their applications for single-line service from New York to Latin America will be heard later.[3]
 
 
 41
 I do not understand my colleagues as questioning the substantial, as distinct from the merely formal, impact of this proposed procedure upon petitioners. Their disposition not to interfere with the course the Board has determined to follow rests upon two foundations. One is essentially the idea that Congress did not intend that the Board, in considering an application by a foreign air carrier under Section 402, should concern itself with the effects of the granting of that application upon a domestic line currently seeking authority under Section 401 to serve the same route. This position seems implicit in the opinion's early reference to "the obligation of the Board as agent of the United States in connection with Lufthansa's application involves Presidential consideration of our international relations with Germany as they arise with respect both to Lufthansa and American domestic carriers operating abroad." If "abroad" here is read as "Germany," as I think may fairly be said to be its import, the thesis seems to be that the Board has no significant aspect of the public interest to weigh under Section 402 other than that of the possible harm to be done to our international aviation interests in Germany if this application is denied. The implication is that to take a broader view of the public interest would be to countenance repudiation or frustration of the Executive purposes in entering into the 1955 agreement with the German Federal Republic.
 
 
 42
 The President cannot, of course, be repudiated or frustrated if he chooses not to be, since he is empowered by the statute, for any or no reason and without exposure to judicial scrutiny, to direct the Board to issue the requested authority to Lufthansa, despite any recommendation the Board might make to the contrary. But the argument seems to be that the Board was not intended by Congress to waste its time in an inquiry which might conceivably lead the Board to be so presumptuous as to recommend in the public interest a course of action contrary to that contemplated by an executive agreement. A President who had not negotiated the agreement in question, and a Congress which has no function with respect to the approval or disapproval of executive agreements, might each be of the view that the Board's conception of the entire public interest at any one point in time would be a useful element in the President's store of knowledge as he turns to the discharge of his responsibilities under Section 801.
 
 
 43
 Now there is no question but that our international relations are a highly important factor for the Board to take into account under Section 402. But it is not the only one, nor is there to be attributed to it, in my view, the almost overpoweringly dominant role contemplated by the majority opinion. It would have been very easy for Congress to make plain its purpose to make it so, if such purpose it had. Section 402 could clearly have said that, where the President has made a commitment to another sovereign nation that a national of the latter designated by it shall be permitted to serve the United States, the only issue before the Board upon such an application is the fitness, willingness, and ability of the designee to provide the service and to observe our regulatory laws and regulations. Section 402 presently says as much. It also says more, namely, that the Board is to find, further, that the "transportation will be in the public interest."
 
 
 44
 Throughout I follow only the Board's reading of the statute. Its own concept of what it may do in passing upon an application under Section 402 is set forth at pp. 7-8 of its brief. A fair summary is as follows: Despite the provisions of Section 1102, directing the Board to act "consistently" with any international commitment, the Board "considers that it is not required to recommend issuance of a foreign carrier permit to the President merely because there is an agreement providing for such permit." The Board receives evidence in respect of each of the various standards set forth in Section 402. As to that of the public interest, it "normally" regards the predominant issue to be that of whether the application should be granted because of reciprocity considerations. But where it is asserted that the grant will be injurious to U. S. carriers, "hence contrary to the public interest," it weighs that adverse impact against the reciprocity benefits, and submits its findings and conclusions to the President so that "he has the benefit of the Board's views in determining what his action should be." The existence of a bilateral executive agreement is, in the Board's view, a "prima facie public interest factor pointing to the grant," and a "strong showing would be required to warrant a recommendation to the President that the application should be denied and the bilateral denounced."
 
 
 45
 This all seems to me to say that one who hopes to persuade the Board to recommend to the President the denial of a foreign air carrier permit contemplated by an executive agreement has something of an uphill road. But the way is there if he can make it, and the Board will, upon a "strong showing," tell the President that it believes the time has come to deny the permit and to denounce the agreement. I do not understand petitioners to be under any illusions as to the difficulties they face, or to be complaining about them. Their claim is, rather, that fair hearing comprehends the opportunity to mount the attack on a scale commensurate with the barrier to be breached.
 
 
 46
 With the relevant standards prescribed as stated above, Section 402 directs that public notice be given of the application, and that a public hearing be held, with participation in the latter contemplated to be accorded to "any interested person." The Board in this case has recognized its obligation in the latter respect by permitting the intervention of petitioners in the Section 402 hearing, and it tells us that it will receive evidence from them. But the Board also tells us that, by reason of the narrower scope which it places upon the concept of "public interest," petitioners will be limited in their showing to representations of the adverse economic effect upon them and, that upon a record so confined, the Board will proceed to formulate and transmit its recommendation to the President before it turns to the more leisurely labor of hearing petitioners' applications. My colleagues say in substance, and as the second base of their holding, that, even if the Board be deemed to be something more than a mere agent of the President in his conduct of our international relations with Bonn, this restricted hearing which the Board proposes to give petitioners is amply adequate to the objectives which Congress subsumed under the rubric of "the public interest."
 
 
 47
 Absent a more precise definition of that term than Congress has given us, I am not convinced that this is so, nor that the shadow of Ashbacker does not fall squarely across the procedure the Board has in prospect for the handling of these applications. The concept of the "public interest," when used in a public utility licensing statute, immemorially and customarily comprehends, among others, such things as which of two or more competing applicants can render the best and cheapest service to the public. Until Congress says plainly that a consideration of this kind is not to enter into the exploration of "public interest" as that term is used in Section 402, I am disabled from saying that it is irrelevant. The Board, however, does not intend to afford petitioners an opportunity to make the affirmative case in support of their own applications until after its recommendation with respect to Lufthansa has gone to the President. By the time the Board hears, decides, and makes recommendations to the President with respect to petitioners' applications, the additional service provided by Lufthansa may be the last straw on the economic back which compels the Board to effectuate its preliminary determination that the market will not support both Panagra and Braniff. What consolation would there then be for petitioners, or for the travelling public, in the knowledge that both petitioners had demonstrated by affirmative evidence their ability to furnish a better and cheaper service than the foreign carrier? Is it conceivable that Congress intended that the President should know that before he acted on any of the Board's recommendations?[4]
 
 
 48
 I do not, of course, intimate any opinion that petitioners can in fact make such a showing. We are concerned here, however, with the scope and timing of administrative hearings, and not with their likely result. The Supreme Court in Ashbacker was not motivated by any conjecture that the aggrieved applicant would probably prevail if he could only stave off decision until the merits of his case were before the agency. It was impelled to the result it reached by its divination of the sense of Congress as to what would constitute a fair hearing under the special circumstances there present. I am not persuaded that the problem here arises in a setting so different as to justify a contrary appraisal of the legislative will.
 
 
 49
 Had the Board elected to follow a different plan and to hear both the 401 and 402 applications before making its recommendations to the President as to each, I doubt that a protest by any one of the applicants would be regarded by us as presenting any serious legal problem. What is argued in substance to us now by the Board is that it cannot so elect because it will take it too long to hear and pass upon petitioners' applications; and that the resulting delay will embarrass the President and the Secretary of State in their conduct of our relations with Germany. But Ashbacker appears to me to contemplate some delay as a price Congress was willing to pay for fairness; and there is nothing in this record demonstrating utter incapacity in the Board to minimize the asserted embarrassment to the Executive by proceeding to hear and determine these applications with greater dispatch than has perhaps been characteristic of major route proceedings in the past.
 
 
 
 Notes:
 
 
 [1]
 The order under review represents a procedural determination as to how certain applications are to be handled. It decides nothing with respect to the merits of the applications. Whether or not it is properly regarded as final rather than interlocutory for judicial review purposes, it does not constitute an order "subject to the approval of the President" within the reach of Section 1006 (a). That category is reserved for orders of the Board which are inextricably intertwined with the merits of the grant or denial of applications. Congress cannot be taken to have intended that the President pass upon the various procedural orders made by the Board in the course of moving towards a recommendation on the merits. I do not find British Overseas Airways Corp. v. C. A. B., 113 U.S.App.D.C. 76, 304 F.2d 952 (1962), to be to the contrary. There, the Board initiated a proceeding looking toward the promulgation of a proposed regulation amending the conditions upon which a foreign air carrier permit was to continue to be held. The carrier's motion to dismiss the proceeding was denied, and review was sought here of that order. This court thought such review was barred by Section 1006(a), for the reason that the conditions upon which foreign air carrier permits are to be granted or withheld is ultimately a matter committed to the President's sole discretion. The court felt that it could not review the Board order in question without getting into the area of Presidential discretion. BOAC did not involve a claim of unfairness in respect of a procedural determination; it involved substantive issues, the resolution of which by this court would inevitably impinge upon the role assigned to the President by Congress. Conversely, how the Board schedules its hearings in this case does not infringe in any way upon the President's latitude of action in determining whether, or upon what conditions, to grant Lufthansa's application
 
 
 [2]
 Delta Air Lines, Inc. v. C. A. B., 97 U.S.App.D.C. 46, 228 F.2d 17 (1955). See, also, Delta Air Lines, Inc. v. C. A. B., 107 U.S.App.D.C. 174, 275 F.2d 632 (1959), cert. denied, 362 U.S. 969, 80 S.Ct. 953, 4 L.Ed.2d 900 (1960), and Northwest Airlines, Inc. v. C. A. B., 90 U.S.App.D.C. 158, 194 F.2d 339 (1952)
 
 
 [3]
 Some chronology may help to put the legal issue before us in perspective. The Board's order initiating an investigation of petitioners' routes and certificates was entered August 8, 1961. In response to what that order foreshadowed, petitioners filed applications to extend their service to New York in June and September, 1962, respectively. Lufthansa's application was filed February 27, 1964. This last application was set down for hearing to commence June 10, 1964, whereas petitioners were told that their applications would not be reached for hearing before January of 1965. The hearing for Lufthansa has been stayed by this court pending this appeal
 
 
 [4]
 The President has, of course, an absolute and unreviewable discretion to do as he pleases, and without stating his reasons, in accepting or rejecting the Board's recommendations in respect of international routes. What petitioners seek here, however, is a meaningful chance to try to persuade the Board that its recommendations to the President should be one way rather than another. That is not an insubstantial privilege, as anyone knows who is familiar with the phenomenon in large organizations of first-draft inertia. The Board is made up of Presidential appointees, presumably chosen for their expertise and because the President has confidence in their judgment. It is not to be assumed that a course of action recommended to the President by the Board is without significant weight in his deliberations