**AMERICAN DREDGING CO. v. COCHRANE.**

**No. 10723.**

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 8, 1950.

Decided May 31, 1951.

Geoffrey Creyke, Jr., Washington, D. C., with whom Andrew A. Lipscomb, and Robert M. Gray, Washington, D. C., were on the brief, for appellant.

Ross O'Donoghue, Asst. U. S. Atty., Washington, D. C., with whom George Morris Fay, U. S. Atty., Washington, D. C., was on the brief, for appellees.

Joseph M. Howard, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellees.

Before PRETTYMAN and BAZELON, Circuit Judges, and KIMBROUGH STONE, Circuit Judge, retired (sitting by designation).

STONE, Circuit Judge.

This is an action against the members of the Maritime Board (individually and officially) and the Secretary of the Navy (individually and officially) to prevent disposal of a dredger barge, the Marshall C. Harris, and to compel return thereof to plaintiff under the provisions of the Act of May 18, 1944, 58 Stat. 223, Tit. 50 U.S.C.A.Appendix, § 1301 et seq., being Public Law 305 of the 78th Congress. The trial court dismissed the petition for want of jurisdiction because it was a nonconsent suit against the United States. From that order of dismissal this appeal is brought.

The sole question here is the existence of the ground of the ruling below. The situation, as shown by the petition with its attached exhibits, is as follows.

This vessel was owned by plaintiff and was under charter to a group of contractors who were doing work for the United States under a cost-plus contract. While so engaged, it sank at the entrance of Pearl Harbor in twenty-five feet of water on April 2, 1943. At that time, it was being used in extensive construction activities, in and around Pearl Harbor. Abandonment of the dredge was not considered as it was readily salvageable; was urgently needed in connection with war operations; and was an obstruction to navigation. It was determined that salvage could be done only by the Navy Department, since war conditions made it impracticable for either the owner or the underwriters to raise and tow the dredge to the West Coast and repair her there. The Navy commenced salvage in June, 1943.

In connection with this charter, the dredge had been covered by comprehensive insurance in the amount of $600,000.00 in favor of plaintiff and the charterers. In May, 1943, a "tender of abandonment" claiming total loss was made by plaintiff to the underwriters and rejected. Negotiations between plaintiff, the charterers, and the underwriters resulted in a compromise settlement on August 2, 1943. The settlement agreement, if reduced to writing, is not in this record. Its provisions may be found here in the three instruments effectuating it. These are a memorandum agreement between plaintiff and the charterers, dated September 18, 1943; a "Full Release" of liability of the underwriters by plaintiff and the charterers, dated September 10, 1943; and a warranty bill of sale of the dredge (with "her gear, equipment and two swing anchors") to the United States, dated September 10, 1943. The pertinent parts are set forth in the footnote.[1]

1. These provisions are quoted from the memorandum agreement between plaintiff and the charterers of September 10, 1943. "1. Owner shall sell, transfer and deliver said dredge Marshall C. Harris, her gear, equipment, and two swing anchors 'as is' and 'where is' to the United States of America.

"2. Charterer shall assume all expenses heretofore incurred and which may be incurred hereafter in connection with the salvage and raising of the dredge.

"3. Charterer shall join in the execution of any releases or documents that may be required by the underwriters in order to effectuate the settlement and permit the payment of the sum of $450,000 to Owner.

"4. Charterer is hereby relieved of liability for charter hire of dredge, her gear and equipment, from and after the

The dredge was refloated on September 2, 1943—a month after the settlement agreement and eight days before the first of the three implementing documents was executed. After the floatage, rehabilitation was completed by the United States. Subsequently, the Navy bought the auxiliary plant and equipment (neither covered by insurance) from plaintiff for ninety thousand dollars. The dredge was sent to Guam in February, 1945 and used continuously by the United States until August, 1948. Then it was sent to Long Beach, California.

It was declared surplus by the Navy and made available to the Maritime Commission in April, 1949. July 1, 1949, officials of the Commission wrote plaintiff that the status of the vessel "insofar as Public Law 305, 78th Congress, is concerned" had not been determined and inquiring whether plaintiff was interested in acquiring it. This letter expressly stated it was not to be regarded as "notice" under section 2 of Act 305. Negotiations between the Commission and plaintiff continued until March 2, 1950. These negotiations centered on whether or not Public Law 305 was applicable to the vessel. On this date, the Commission reaffirmed its earlier determination (December 22, 1949) that this Law was not applicable.

▬▬ The basic contentions of the plaintiff are that the vessel was declared surplus property and turned over to the Commission for disposition; that it then became subject to Public Law 305; that the Commission had no power to determine the applicability of Law 305; that it had only the ministerial duty of complying with that Law; and that, since the failure to comply with such duty resulted in the invasion of or injury to the rights of the plaintiff, the doctrine of sovereign immunity is inapplicable.

This contention must be denied under authority of Larson v. Domestic & Foreign Commerce Corporation, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628. After a thorough examination of earlier cases dealing with the sovereign immunity of the United States, Chief Justice Vinson stated a rule of decision which is here controlling. That rule is: that, if *specific* relief is sought against the sovereign, requiring action by the sovereign or disturbing the sovereign's property, the action is one against the sovereign whether a named party to the action or not, 337 U.S. at pages 687–688, 698, 704, 705, 69 S.Ct. at pages 1460–1465–1468–1469, 93 L.Ed. 1628. The Larson case was one involving the sale of Government property —a situation emphasized in the concurrence of Mr. Justice Douglas, 337 U.S. at page 705, 69 S.Ct. at page 1469, 93 L.Ed. 1628.

Here, there is no question that this vessel is the property of the United States. The purpose of this action is to transfer title therein and possession thereof to plaintiff under the terms of Public Law 305.[2] Such transfer requires affirmative action

date of the sinking and shall also be relieved of all other obligations under said charter-party with respect to the dredge, her gear and equipment.

"5. No charter hire shall be payable by Charterer to Owner for auxiliary plant and equipment specified in the exhibits attached hereto for the period from April 2, 1943, to August 2, 1943, inclusive.

"6. Charter hire for the auxiliary plant and equipment specified in the exhibits attached hereto shall be at the rate of $3000 per month from and after the 2d day of August, 1943, which sum shall be paid to Owner by Charterer as provided in said charter party.

"7. Charterer or the United States of America shall have the privilege of purchasing the auxiliary plant and equipment specified in the exhibits attached hereto or any part thereof at a fair price, in which event the said monthly hire of $3000 shall be proportionately reduced thereafter to compensate for any gear or equipment so purchased."

The sale to the United States was "as is" and "where is" for a consideration of ten dollars.

2. While the particular act—"notice" under section 2 of the Act—is argued by appellant as the matter involved here, yet, if such notice be given, it automatically sets in motion the entire procedure which will result in reacquirement of the dredge by appellant. Also, the prayer of the petition asks that defend-

by officers of the United States acting in their official capacities as representing the United States, and such action would deprive the United States of property it now owns and possesses. This is the kind of specific action denied in the Larson case. Also, see Goldberg v. Daniels, 231 U.S. 218, 34 S.Ct. 84, 58 L.Ed. 191, approved in the Larson case, 337 U.S. at page 700, 69 S.Ct. at page 1466, 93 L.Ed. 1628; and see Seiden v. Larson, 88 U.S.App.D.C. ——, 188 F.2d 661. While the petition states that the suit is against the defendants "individually" as well as in their official capacities, yet the relief sought could be secured only if they acted officially.

■ This judgment must be affirmed on an additional ground. A recognized exception to the foregoing "specific relief" rule is where the alleged injury is caused by officials acting beyond the statutory authority delegated to them, Larson case, supra, 337 U.S. at page 689, 69 S.Ct. at page 1461, 93 L.Ed. 1628. This means an entire lack of such authority and not simply an error in the exercise of authority, Larson case, supra, 337 U.S. at page 690, 69 S.Ct. at page 1461, 93 L.Ed. 1628. This petition pleads refusal of the members of the Maritime Commission to do an act which, plaintiff alleges, is purely ministerial and is required by Public Law 305. A non-discretionary act required by statute to be performed by an official or an agency is within the exception stated in the Larson case.

The act claimed to be required is "notice" to plaintiff that it may reacquire the dredge upon compliance with conditions prescribed in the Act. The Commission determined that this vessel, "under the circumstances of her subsequent acquisition and rehabilitation by the Navy", did not come within the purview of Public Law 305. The issue thus presented is that of the authority of the Commission to consider whether Public Law 305 is applicable to this vessel. If this authority exists, a mistake in exercising it would fall outside the exception in the Larson case and would leave this suit

as one violating the sovereign immunity of the United States. Determination depends upon construction of the Act.

This Act deals with the disposition to private ownership of certain vessels, acquired through purchase or requisition by the United States, and no longer needed in the public service. Section 1 describes the classes of the vessels. The description includes vessels of one thousand tons or less —this dredge is less than such maximum tonnage. The plan of disposition is set forth in sections 2 and 3. Section 2 declares a preferential right of reacquisition in the former owner of the vessel and defines the conditions governing such reacquisition. Section 3 provides for sale on competitive sealed bids where the former owner fails to exercise his rights under section 2.

Section 2 is as follows: "Sec. 2. Every such vessel shall, upon determination by the department or agency having possession thereof that the vessel is no longer needed or can be spared by such department or agency without detriment to its service, be made available to the Administrator of the War Shipping Administration (hereinafter referred to as the Administrator), who shall notify the owner from whom such vessel was purchased or requisitioned that the vessel may be returned to such owner upon repayment to the United States of the compensation paid therefor less such allowances as the Administrator may deem reasonable (1) to cover the cost of such reconditioning as the Administrator after consultation with the owner deems necessary to restore the vessel to condition and utility at least as good as when acquired by the United States (ordinary wear and tear excepted), and (2) to compensate such owner for the use of the vessel by the United States, and upon compliance with such other terms and conditions as the Administrator may prescribe. The determination of such allowances by the Administrator shall be final notwithstanding any other provision of law."

ants be "ordered, compelled and required to perform their ministerial du-

ties * * * to return to this plaintiff * * * the said vessel * * *."

■ A bare reading of this section would seem to support the contention of appellant. This does not end the matter. Sometimes, when the words of a statute are pressed down upon unyielding facts a misfit appears which calls for searching deeper than mere words. Then the guide is found in the purpose of the statute. If the words—construed to give effect to that purpose—lead to absurd, Haggar Co. v. Helvering, 308 U.S. 389, 394, 60 S.Ct. 337, 84 L.Ed. 340, or even unreasonable, United States v. American Trucking Ass'ns, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345, results, the words must bend to the statutory purpose. How do the words and the purpose of this Act fit the fact situation here?

The matter swings with the statutory conditions required for reacquisition and the physical condition of this vessel when bought by the United States. The statutory conditions are repayment to the United States of the cost price less (1) cost of reconditioning and (2) compensation to the owner for the use of the vessel. Concisely, these conditions create a situation exactly the same as though the vessel had been hired and is to be returned (conditioned) with payment to the United States of an excess of price over costs of conditioning and hiring.

The fact situation is that ten dollars were paid by the United States for a vessel which had been under water for months; which had been reconditioned and used by the United States for two years; and which had been returned to Long Beach.

■■ Clearly, the statutory conditions contemplated and are reasonably applicable only where a usable vessel was acquired by the United States for a relatively substantial price. Unless the purchase price be substantial, what practical meaning can be attributed to the reductions thereof by cost of reconditioning and by compensation for use? Could the Congress have meant the Act to cover payment of a substantial price for a useless vessel?

If the vessel was useless when acquired by the United States, what place can be found here for reconditioning "to restore the vessel to condition and utility at least as good as when acquired by the United States (ordinary wear and tear excepted)" and for compensating the owner for its use? The clear purpose was to replace a purchase situation with one equivalent to a return in the acquired condition and payment of hire. This purpose cannot be fitted to facts alleged here.

When this vessel was acquired on September 10 by the United States, it had been afloat only eight days. For more than two months it had rested at the bottom of twenty-five feet of water before salvage commenced. It was five months between sinking and floatage. Plaintiff had tried to abandon it as a total loss in connection with its claim for insurance. Because of the war, plaintiff could not have raised or reconditioned the vessel. During the negotiations between the plaintiff, charterers, underwriters and the Navy, the Navy undertook the salvage inasmuch as the dredge was salvageable; was urgently needed in war operations; and was an obstruction to navigation. The negotiations resulted in an agreement which eliminated the charterers; provided for warranty sale to the United States by the plaintiff; and release of the underwriters on payment of $450,000.00 to plaintiff. The purchase price paid by the United States was ten dollars. Thereafter, the United States rehabilitated the vessel; used it during the war; and paid plaintiff $90,000.00 for the auxiliary equipment.

If this Act is applicable, the result will be that plaintiff will have back its dredge and $450,000.00. All for a vessel useless when appellant sold it to the United States for ten dollars. Such a result is certainly unreasonable if, indeed, it be not absurd.

How is this improper application of this Act to be avoided? Obviously, some official agency must determine when the Act is applicable. No *express* authority is given to the Maritime Commission or to any other official or agency to make this determination. At the same time, the Administrator of the War Shipping Administration is the official agency designated by the statute to issue the required notice. Since some agency must decide when the notice is required, it seems clear

that he was that agency. The Maritime Commission was his successor in office. We think, therefore, that the Commission must be deemed to have such authority.[3]

So construing the Act, the duty of the Commission was not merely the ministerial one of giving notice. If it erred—which we do not intimate—it was not for lack of power but for an unwise exercise there-

of. As such, its action did not fall within the exception stated in the Larson case. This suit is against an official exercising a statutory power in respect of property admittedly belonging to the United States. As such, it is an action against the United States.

The judgment is

Affirmed.

3. Compare In re Hohorst, 150 U.S. 653, 661–662, 14 S.Ct. 221, 37 L.Ed. 1211; National Labor Relations Board v. Hearst Publications, 322 U.S. 111, 123, 64 S.Ct. 851, 88 L.Ed. 1170; United States v. Powers, 307 U.S. 214, 217, 59 S.Ct. 805, 83 L.Ed. 1245; Bird v. United States, 187 U.S. 118, 124, 23 S. Ct. 42, 47 L.Ed. 100; National Homeopathic Hospital Ass'n v. Britton, 79 U.S.App.D.C. 309, 312, 147 F.2d 561, 564, certiorari denied 325 U.S. 857, 65 S.Ct. 1185, 89 L.Ed. 1977; Arthur v. Compagnie Generale Transatlantique, 5 Cir., 72 F.2d 662, 664.