PAN AMERICAN WORLD AIRWAYS, INC. and Trans World Airlines, Inc., Petitioners,

v.

CIVIL AERONAUTICS BOARD, Respondent,

Sudflug Suddeutsche Fluggesellschaft mbH, Intervenor.

PAN AMERICAN WORLD AIRWAYS, INC. and Trans World Airlines, Inc., Appellants,

v.

Robert T. MURPHY et al., Appellees, Sudflug Suddeutsche Fluggesellschaft mbH, Intervenor.

Nos. 20860, 21149.

United States Court of Appeals District of Columbia Circuit.

Argued Nov. 13, 1967.

Decided Jan. 31, 1968.

Mr. William E. Miller, Washington, D. C., with whom Messrs. Richard P. Taylor, James V. Dolan and Hubert A. Schneider, Washington, D. C., were on the brief, for petitioners in No. 20,860 and appellants in No. 21,149.

Mr. O. D. Ozment, Deputy General Counsel, Civil Aeronautics Board, with whom Asst. Atty. Gen. Donald F. Turner and Messrs. Joseph B. Goldman, General Counsel, Warren L. Sharfman, Associate General Counsel, Litigation and Legislation, and Robert L. Toomey, Attorney, Civil Aeronautics Board, and Howard E. Shapiro, Attorney, Department of Justice, were on the brief, for respondent in No. 20,860 and appellees in No. 21,149.

Mr. Paul Reiber, Washington, D. C., with whom Mr. Mario F. Escudero, Washington, D. C., was on the brief, for intervenor.

Before EDGERTON, Senior Circuit Judge, and WRIGHT and ROBINSON, Circuit Judges.

**J. SKELLY WRIGHT, Circuit Judge.**

These consolidated appeals challenge a single order of the Civil Aeronautics Board (Order E–24697) adopted under Section 402 of the Federal Aviation Act, 49 U.S.C. § 1372 (1964 ed.), and approved by the President under Section 801 of the Act, 49 U.S.C. § 1461 (1964 ed.), temporarily authorizing a small German airline, Sudflug,[1] to fly inclusive tour charters from Germany to the United States. In the course of the proceedings culminating in the issuance of Sudflug's permit, the Board declined to exercise jurisdiction over the unlicensed German tour operators who will be organizing the inclusive tours[2] and chartering Sudflug's aircraft. The petitioners, two large, regularly scheduled, United States air carriers holding certificates of public convenience and necessity to fly between the United States and many points throughout the world, challenge this declination of jurisdiction. In No. 20,860 they have petitioned for direct review of the Board's non-exercise of jurisdiction as it is embodied in Order E–24697, while in No. 21,149 they have appealed from the District Court's dismissal of their

1. Full name: Sudflug Suddeutsche Fluggesellschaft. It is, essentially, the German counterpart of a United States supplemental air carrier. See 49 U.S.C. § 1301 (32), (33) (1964 ed.). There are two basic types of commercial air carriers. "Trunkline carriers," such as petitioners here, have traditionally provided regularly scheduled air transportation service while "supplemental air carriers," also known as "non-scheduled" or large irregular airlines, have, as the name implies, been limited to supplementing the scheduled airlines, primarily through military and civilian charter service.

2. The term "inclusive tour" is generally synonymous with an "all expense" or "package" tour which includes, along with the basic air transportation, various land arrangements such as lodging, meals and sightseeing. 14 C.F.R. § 378.2(b) (Supp. 1967). An inclusive tour charter is an arrangement by which the air carrier charters its aircraft to a "tour operator" who in turn sells the inclusive tour, including all air transportation, to the general public for a single price.

companion suit against the members of the Board for a declaratory judgment that the Board's refusal to exercise jurisdiction was in violation and excess of its statutory power, and for mandamus directing them to exercise jurisdiction over the German tour operators.

■ Petitioners' argument on the merits is the same in both actions. They contend that, since the persons who will organize the tours in Germany and will charter Sudflug's aircraft for their patrons will be "indirect foreign air carriers" under the Federal Aviation Act,[3] the Board's refusal to require them to secure air carrier permits was illegal under the Act and consequently the Sudflug permit must be set aside. Petitioners filed companion actions in this and in the District Court because neither path to review of the Board's action is unobstructed by jurisdictional obstacles. However, because we uphold the Board's interpretation of the statute it administers as authorizing the declination of jurisdiction challenged here, we do not decide the jurisdiction to review questions.[4]

## I

Sudflug is a German air carrier which holds a foreign air carrier permit from the Board authorizing it to engage in certain charter foreign air transportation between Germany and the United States. The genesis of the controverted proceedings at issue here was Sudflug's application, which was forwarded to the Board by the German Government through diplomatic channels, for additional authority to operate inclusive tour charter flights during the period of the existing permit. Thirty such inclusive tour charters were projected for 1967, 16 of which were to be organized by two well established and experienced German tour operators, Scharnow and Touropa, both of whom made an appearance before the Board. The other 14 inclusive tour charters were to be undertaken by non-appearing, unnamed, German tour operators. Under Sudflug's proposal, the tours are to be arranged, sold and conducted by the tour operators. As the sellers of the tour packages, the tour operators, not Sudflug, would determine how much each tour purchaser will pay for air transportation and connecting ground services. Sudflug aircraft and crews would then be chartered by the tour operators for the transatlantic air transportation which had been sold to tour members.

Scharnow and Touropa argued before the hearing examiner and the Board that despite their proposed tour operations in conjunction with Sudflug they are not "foreign air carriers" subject to the permit requirement of Section 402(a) of the

---

3. Under the Federal Aviation Act, "foreign air transportation" is defined as "the carriage by aircraft of persons or property as a common carrier for compensation or hire * * * in commerce between * * * a place in the United States and any place outside thereof * * *." 49 U.S.C. § 1301(21) (c). And a "foreign air carrier" is "any person, not a citizen of the United States, who undertakes, whether directly or indirectly or by lease or any other arrangement, to engage in foreign air transportation." 49 U.S.C. § 1301 (19).

4. It is established doctrine that courts may, in appropriate cases, bypass jurisdictional issues with a decision on the merits. *See* Ex parte Bakelite Corp., 279 U.S. 438, 448, 49 S.Ct. 411, 412, 73 L.Ed. 789 (1929), where the Supreme Court did not resolve the question of its power to issue

a writ of prohibition since it decided that even if it had the power there was "no tenable basis for exercising it" in that case; Secretary of Agriculture v. Central Roig Refining Co., 338 U.S. 604, 619–620, 70 S.Ct. 403, 94 L.Ed. 381 (1950), where the Supreme Court upheld an order of the Secretary of Agriculture and avoided the issue of whether the Commonwealth of Puerto Rico had standing to challenge the order in the first place. *See also* Rabinowitz v. Kennedy, 376 U.S. 605, 607, 84 S.Ct. 919, 11 L.Ed.2d 940 (1964); Brooks v. Dewar, 313 U.S. 354, 359–360, 61 S.Ct. 979, 85 L.Ed. 1399 (1941); Rice v. District of Columbia, 128 U.S. App.D.C. 194, 385 F.2d 976 (1967); Blount Brothers Construction Co. v. Troitino, 127 U.S.App.D.C. 99, 381 F. 2d 267 (1967); Carrington v. C. A. B., 4 Cir., 337 F.2d 913 (1964).

Act.[5] Alternatively they urged that, in any event, the Board should not exercise any jurisdiction it did have because all of the tour operators' services would be performed in Germany and would involve German residents. Consequently their obligations to their patrons would be subject to the law of Germany, and no effective regulatory purpose would be served by the Board's attempting to give United States law extraterritorial effect.

Petitioners, Trans World Airlines and Pan American World Airways, as intervenors below, argued that as non-citizen lessees of foreign air transportation the tour operators are clearly foreign air carriers within Section 101(19), 49 U.S. C. § 1301(19), of the Act which defines a foreign air carrier as "any person, not a citizen of the United States, who undertakes, whether directly or indirectly or by lease or any other arrangement, to engage in foreign air transportation." They argued further that as foreign air carriers the Board was not authorized to permit the tour operators to conduct their services without a permit issued by the Board after a finding by it that the tour operators are "fit, willing, and able properly to perform" their proposed operations and that "such transportation will be in the public interest." [6]

Evidence concerning the organization, experience and financial stability of Sudflug, Scharnow and Touropa was introduced before the hearing examiner. He found that there was no real doubt that Sudflug and the tour operators were capable of mounting the operations contemplated, and that the proposed flights would have "no appreciable adverse impact on the ability of Pan American and TWA to conduct their authorized services." Nevertheless, for reasons not relevant here the examiner recommended a discretionary denial of Sudflug's application[7] and so never considered the tour operators' request that jurisdiction over them be disclaimed or declined.

Meanwhile, the Board's recommendation in Reopened Transatlantic Charter Investigation, Order E-24240, September 27, 1966, which was highly relevant to the Board's disposition in *Sudflug*, had wound its way to the President, and on the day of the examiner's decision in

5. Section 402(a) specifies: "No foreign air carrier shall engage in foreign air transportation unless there is in force a permit issued by the Board authorizing such carrier so to engage." 49 U.S.C. § 1372(a).

6. Under Section 402(b) of the Act, the Board is empowered to issue the permit required in Section 402(a) "if it finds that such carrier is fit, willing, and able properly to perform such air transportation and to conform to the provisions of this chapter and the rules, regulations, and requirements of the Board hereunder, and that such transportation will be in the public interest." 49 U.S.C. § 1372 (b).

While United States citizen indirect carriers—carriers not directly engaged in the operation of aircraft in air transportation—may, by order of the Board, be relieved "from the provisions of [the Act] to the extent and for such periods as may be in the public interest" (49 U.S.C. § 1301(3)), there is no explicit language permitting the Board to exempt non-citizen indirect carriers engaged in foreign air transportation from the Act's coverage. 49 U.S.C. § 1301(19).

7. The hearing examiner recommended denial of Sudflug's permit primarily because the proposed inclusive tours did not meet the stringent requirements which the Board had imposed in Supplemental Air Service Proceeding, Order E-23350, March 11, 1966, as a precondition for domestic inclusive tour charters of United States supplemental air carriers. These requirements for domestic inclusive tour charters included, among others, that (1) there be one tour operator (not a direct air carrier) per charter flight, with a limit of three tour groups per aircraft; (2) a tour serve a minimum of three destinations, at least 50 miles apart; and (3) the tour price charged the passenger must be not less than 110% of the lowest applicable scheduled fare.

While the Board shared certain of the examiner's apprehensions, by the time the case reached it for decision, Sudflug had restructured its proposal in an effort to meet some of the examiner's objections and the Board felt that these modifications, along with the intervening developments in the Reopened Transatlantic Charter Investigation (*see* text at pages 487–488) impelled approval of the application.

*Sudflug* he adopted the Board's *Transatlantic* proposal. The President agreed with the Board's determination in *Transatlantic* that the public convenience and necessity required inclusive tour charter operations by United States supplemental air carriers to points in Europe, including Germany, and he approved the Board's authorization of such services to six United States supplemental carriers.[8]

In part because of the President's approval in *Transatlantic*, the Board voted to recommend to the President favorable action on Sudflug's application. In its opinion urging approval of this application, the Board explained in some detail why it had not accepted the examiner's recommendation. The Board found that Sudflug's operations would stimulate underdeveloped German tourism to the United States and that expenditures by German tourists here would help reduce our international balance of payments deficit. At the same time such operations, limited to the "carriage of German-originated passengers," would have no significant adverse impact on United States scheduled carriers. And, because of the developments in *Transatlantic*, the Board felt that considerations of comity and the public interest in obtaining landing rights in Germany for inclusive tour charters operated by United States carriers provided additional justification for its favorable recommendation of Sudflug's application. Though the Board shared certain of the examiner's reservations about Sudflug's proposal, it felt that authorization for only 30 inclusive tours was, on balance, in the public interest.

On the jurisdictional question at issue here, the Board felt that the tour operators participating in Sudflug's proposal were indirect foreign air carriers and consequently that it did have jurisdiction over them. Nevertheless, the Board decided that it could and would decline to exercise it. In its opinion the Board set out its reasons for not asserting jurisdiction:

"The question remains whether as a matter of policy and discretion the Board should exercise its jurisdiction over the foreign tour operators. We find a number of compelling reasons why we should not do so. It would be extremely burdensome for foreign tour operators to comply with the hearing and other requirements of sections 402 and 801 of the Act. Their offices are outside of the United States. Many may be interested in performing only one or at most a few tours. Under our normal procedures they would be required to file an application through diplomatic channels, retain counsel, and attend hearings. Until the permit was approved by the President there would be no assurance that the tour could be

---

8. The Board's decision in *Transatlantic* has been set aside by the Second Circuit on the ground that the Board has no statutory power to authorize inclusive tour charters by United States supplemental air carriers. Pan American World Airways, Inc. v. C. A. B., 2 Cir., 380 F.2d 770 (1967). This holding squarely conflicts with this court's prior holding in American Airlines, Inc. v. C. A. B., 125 U.S.App.D.C. 6, 365 F.2d 939 (1966), where we upheld the Board's authorization of certain supplemental air carriers to operate domestic inclusive tours. Both the orders we approved and the orders the Second Circuit set aside emanated from the same proceedings known as the Supplemental Air Service Proceeding and the Reopened Transatlantic Charter Investigation. In both cases the issue was precisely the same: whether the Board's statutory authority to issue certificates of public convenience and necessity for "supplemental air transportation," defined as charter trips in air transportation, includes the power to authorize inclusive tour charters. The Board's action was subjected to review in two different courts only because those orders dealing with domestic flights in the *American Airlines* case were subject to immediate review while those involving overseas flights in *Pan American* had to await Presidential action before review was available. The Board on December 22, 1967, petitioned for a writ of certiorari from the Supreme Court in Pan American to resolve the conflict. 36 U.S.L.WEEK 3265 (January 2, 1968). Certiorari was granted January 29, 1968. 390 U.S. 919, 88 S.Ct. 850, 19 L.Ed.2d 978 (1968).

performed. Further, the mounting of an inclusive tour program requires a considerable lead time if it is to be accomplished successfully. That fact, coupled with the difficulty, expense, and uncertainty of complying with the licensing procedures, could discourage potential tour operators from entering the field and thereby inhibit the development of inclusive tours. In practical effect, this would deny effective reciprocity and prejudice the ability of U. S. operators to obtain needed authority from foreign countries for their own services.

"Regulation of foreign tour operators is not required to protect American Flag carriers, since any adverse effect which they may sustain from activities of foreign tour operators should be negligible. It is not required for the safety of the tour passengers since we will continue to require the direct air carrier, who will actually be responsible for the operation of the aircraft, to demonstrate in an appropriate proceeding under section 402 of the Act, that it is fit, willing, and able in terms of financing, organization, equipment, personnel, and otherwise to perform the air transportation. Accordingly, were we to enter the field, our control would be directed mainly to the quality of the service provided by foreign tour operators to foreign originating tour groups—a matter which concerns primarily the foreign governmental authorities." (Footnote omitted.)

Though the Board admitted that by asserting jurisdiction it might occasionally prevent an unsuitable tour operator from entering the field, it felt that any benefit from C. A. B. regulation would be far outweighed by the undesirable results such regulation would create. The Board also pointed out that because solicitation and nearly all other aspects of the tour arrangement would be effected outside the United States, and would involve foreign businesses dealing for the most part with foreign nationals, the discovery and investigation of violations as well as effective extraterritorial enforcement of regulations would be virtually impossible.

Moreover, the Board emphasized that by declining to exercise jurisdiction it would not be abandoning the field to unqualified or unscrupulous tour operators. It felt confident that licensed direct air carriers such as Sudflug, whose qualifications are subject to continuous review by the Board, would, in their own self-interest, confine their dealings to financially responsible and qualified tour operators. If regulation of these operators proved necessary, the Board felt that it could be accomplished via the direct carrier involved; for the Sudflug permit which the Board recommended be issued reserved to the Board the right to require advance approval of individual inclusive tour charters if it found such action required by the public interest.

On January 30, 1966, the President approved the award to Sudflug and the disclaimer of jurisdiction embodied in it. Petitioners did not seek agency reconsideration, but instead sought direct review in this court under Section 1006, 49 U.S.C. § 1486(a) (1964 ed.), and, in a companion suit, sought a declaratory judgment and mandamus against Board members in a suit initiated in the District Court. The Section 1006 action was held in abeyance pending the District Court's disposition of the mandamus proceedings. Meanwhile the Board moved in the District Court for dismissal or summary judgment and petitioners filed a cross-motion for summary judgment. The Board's motion to dismiss was based on alternative grounds. First, it made the jurisdictional argument that unless a constitutionally protected interest of petitioners was threatened, no court had jurisdiction to review any order in respect of foreign air carriers which are subject to Presidential approval under Section 801, 49 U.S.C. § 1461. Second, it argued that the Board had statutory authority to decline jurisdiction and that here it had exercised its discretion to do so in a reasonable manner. Accordingly, it moved to dismiss the complaint as

failing to state a claim upon which relief could be granted. On June 28, 1967, the District Court dismissed the complaint for both want of jurisdiction and failure to state a meritorious claim.

## II

Argument before both this court and the District Court has been aimed primarily at the very thorny jurisdiction to review questions which are raised by the petition in No. 20,860 and the appeal in No. 21,149. Petitioners maintain that the Board's order is subject to review in one court or the other, while the Board contends that review is available in neither. Petitioners are confident that once the jurisdictional obstacles are hurdled they will prevail on the merits. Their challenge is not aimed primarily at the adequacy of the Board's reasons for not asserting jurisdiction over tour operators, but, rather, at the Board's lack of statutory authority to decline Section 402 jurisdiction no matter how compelling its reasons. Since, as indicated, we find that the Board does have discretion to decline jurisdiction over indirect foreign air carriers and that here it has exercised that discretion reasonably, we do not decide the jurisdiction to review issues. To elucidate the basis for our disposition of this case, however, it is necessary to review the statutory scheme which governs the situation and determine the roles which the Board, the President and the courts are to play in it.

The Federal Aviation Act defines foreign air transportation as "the carriage by aircraft of persons or property as a common carrier for compensation or hire or the carriage of mail by aircraft, in commerce between * * * a place in the United States and any place outside thereof." 49 U.S.C. § 1301(21) (c). The Act then goes on to make a distinction between an "air carrier" which is a United States citizen engaged in any type of air transportation and a "foreign air carrier" which refers to any non-citizen engaging in "foreign air transportation." 49 U.S.C. § 1301(19). With a view toward resolving any possible conflicts which might arise between the Board's policies and those of the President as the exclusive organ of the federal government in the field of international relations, Congress provided in Section 801 that:

> "The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, or air transportation between places in the same Territory or possession, or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. Copies of all applications in respect of such certificates and permits shall be transmitted to the President by the Board before hearing thereon, and all decisions thereon by the Board shall be submitted to the President before publication thereof." 49 U.S.C. § 1461.

This section, by its terms, applies equally to citizen carrier certificates issued under Section 401 and to foreign air carrier permits, like Sudflug's, issued under Section 402. Though the criteria and procedures for determining whether to issue a permit are similar under the two sections, the Board has construed the "public interest" standard of Section 402 as allowing it more discretion than the "public convenience and necessity" standard authorized by Section 401.[9]

In Section 1006, which provides for review of Board orders, Congress drew a sharper distinction between orders with

---

9. Aerovias "Q", S.A., Foreign Air Carrier Permit, 28 C.A.B. 926, 927 (1959). Under the "public interest" standard of § 402, the Board has tended recently to stress, as it has in the instant case, considerations of policy such as the reciprocity requirement of § 1102 of the Act, 49 U.S.C. § 1502 (1964 ed.). Eagle Airways (Bahamas) Ltd., Foreign Air Carrier Permit, 33 C.A.B. 222, 223 (1960). *See* Miller, *The Waterman Doctrine Revisited,* 54 GEO.L.J. 5, 8 n. 18, 19, 20 (1965).

respect to foreign air carriers and those involving domestic carriers engaged in foreign transportation:

"Any order, affirmative or negative, issued by the Board or Administrator under this chapter, *except any order in respect of any foreign air carrier subject to the approval of the President* as provided in section 1461 of this title, shall be subject to review by the courts of appeals of the United States or the United States Court of Appeals for the District of Columbia upon petition, filed within sixty days after the entry of such order, by any person disclosing a substantial interest in such order. After the expiration of said sixty days a petition may be filed only by leave of court upon a showing of reasonable grounds for failure to file the petition theretofore." (Emphasis added.) 49 U.S.C. § 1486(a).

■ Section 1006, then, would seem to preclude review in this court of Sudflug's permit which is, clearly, an order "in respect of [a] foreign air carrier subject to the approval of the President."[10] Pe-

titioners contend, however, that recent decisions of this court and the Second Circuit establish that where the Board acts outside its statutory authority, as petitioners allege it has here, its order is reviewable despite the apparent bar of Section 1006. But the opinions upon which petitioners rely relate to citizen air carriers and are, in essence, the embodiment of the judicial reaction to the Supreme Court's 1948 decision in Chicago & Southern Air Lines v. Waterman Steamship Corp., 333 U.S. 103, 68 S.Ct. 431, 92 L.Ed. 568 (1948), which extended the Section 1006 immunity from judicial scrutiny to all C.A.B. orders subject to Presidential review. The cases have not dealt squarely with the explicit "foreign air carrier" jurisdictional bar of Section 1006 itself.

In *Waterman*, the C.A.B. denied the application of the Waterman Steamship Corporation, a citizen carrier, for an overseas air route and instead awarded the route to one of Waterman's competitors. The President approved the Board's action. The Fifth Circuit

---

10. Petitioners argue that a declination of jurisdiction is not the sort of Board action that is subject to Presidential approval under § 801 and consequently is not an order "in respect of any foreign air carrier *subject to the approval of the President*" which is unreviewable under § 1006. Section 801 provides:

"The issuance, denial, transfer, amendment, cancellation, suspension, or revocation of, and the terms, conditions, and limitations contained in, any certificate authorizing an air carrier to engage in overseas or foreign air transportation, * * * or any permit issuable to any foreign air carrier under section 1372 of this title, shall be subject to the approval of the President. * * *" 49 U.S.C. § 1461.

At issue here, petitioners maintain, is neither the issuance or denial of a permit to a foreign air carrier nor Board action which affects an issued permit, citing Pan American-Grace Airways v. C. A. B., 85 U.S.App.D.C. 297, 299, 178 F.2d 34, 36 (1949), but rather the Board's refusal to exercise its jurisdiction over the German tour operators, thereby allowing them to engage in foreign air transportation without either applying for or obtaining the

foreign air carrier permit required by the statute.

But as petitioners themselves allege in their petition, the Board's declination of jurisdiction of the tour operators constitutes "an integral part and basis of" and is "embodied in" Order E-24697 approving Sudflug's application, which is incontestably an order in respect of a foreign air carrier subject to Presidential approval under § 801. Petitioners do not contend that when the President approved Sudflug's application he did not also approve the Board's non-assertion of jurisdiction concededly "embodied" in it. Indeed there is no order, apart from that approving Sudflug's application, which is before the court. And though an agency determination need not, of course, take the form of an order to be reviewable, the determination must have direct effect on the complainant or place him under an obligation to do something. North Central Airlines, Inc. v. C. A. B., 124 U.S.App. D.C. 251, 363 F.2d 983 (1966); California Oregon Power Co. v. F. P. C., 99 U.S.App.D.C. 263, 239 F.2d 426 (1956). Here the Board's declination of jurisdiction, viewed as disparate from the Sudflug award, has no effect whatever on petitioners.

agreed to review the award, but the Supreme Court, on certiorari, reversed. The case did not involve "an order in respect of any foreign air carrier," yet the Supreme Court held that the Section 1006 prohibition of review was implicitly broad enough to include all orders requiring Presidential approval under Section 801. Though the decision was grounded on the Court's interpretation of Section 1006, its statutory construction was informed by constitutional considerations. Any review after the President acted would impinge on executive prerogative and would involve the Court in "decisions of a kind for which the Judiciary has neither aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry." 333 U.S. at 111, 68 S.Ct. at 436.

Though *Waterman* has not been overruled by the Supreme Court, its apparently sweeping contours have been eroded by recent Circuit Court opinions.[11] This court first acknowledged that some form of judicial review of invalid Board orders might be available in British Overseas Airways Corp. v. C.A.B., 113 U.S.App. D.C. 76, 304 F.2d 952 (1962). That case involved a Board order instituting an investigation involving a proposed regulation affecting *foreign* air carriers. Thus Section 1006, if it applied at all, did so directly, not simply by implication. Petitioner, however, tried to circumvent Section 1006 by challenging the Board order before the President acted on it. This court found that Section 1006 did apply and, in refusing to review the order, said that review in this court was unavailable "now or later"[12] But we added:

"This is not to say that there may not be a judicial remedy against administrative, or even Presidential, action beyond the scope of lawful authority, as defined by the Aviation Act. The petitions will accordingly be dismissed, without prejudice to independent proceedings in the District Court challenging the validity of the proposed regulation if and when promulgated." 113 U.S.App.D.C. at 77, 304 F.2d at 953.

In a subsequent case, American Airlines, Inc. v. C.A.B., 121 U.S.App.D.C. 120, 348 F.2d 349 (1965), we held that the *Waterman* doctrine did not operate to bar direct review in this court of challenges to the validity of C.A.B. orders involving citizen carriers even though subject to Presidential approval.[13] "*Wa-*

---

11. Particularly American Airlines, Inc. v. C. A. B., 121 U.S.App.D.C. 120, 348 F.2d 349 (1965), and Pan American World Airways, Inc. v. C. A. B., *supra* Note 8, 380 F.2d 770. *See also* the precursors of these decisions, *e. g.*, Trans World Airlines, Inc. v. C. A. B., 2 Cir., 184 F.2d 66 (1950), *cert. denied, sub nom.* Sparks v. C. A. B., 340 U.S. 941, 71 S.Ct. 504, 95 L.Ed. 679 (1951), where the court, in following *Waterman*, was careful to point out that "the President and the Board acted within their legal powers in making the order," 184 F.2d at 71, leaving open the question of what the court would have done had the Board acted beyond its lawful authority. *See also* Pan American-Grace Airways, Inc. v. C. A. B., 119 U.S.App.D.C. 326, 342 F.2d 905 (1964), *cert. denied*, 380 U.S. 934, 85 S.Ct. 941, 13 L.Ed.2d 821 (1965) ; Alaska Airlines, Inc. v. Pan American World Airways, Inc., 116 U.S.App.D.C. 128, 321 F.2d 394 (1963) ; British Overseas Airways Corp. v. C. A. B., 113 U.S.App.

D.C. 76, 304 F.2d 952 (1962). *See generally* Miller, *supra* Note 9, 54 Geo.L.J. 5, for a discussion of the extent and direction of this erosion.

12. In *Waterman* itself the Supreme Court had held that until the President acted to approve Board action submitted to him under the Act, there could be no final, judicially reviewable, order. 333 U.S. at 112–113, 68 S.Ct. 431.

13. Our 1965 *American Airlines* decision is to be distinguished from this court's 1966 *American Airlines* decision referred to in Note 8. At issue in the 1965 case was the Board's authority to revise its regulations to allow certified domestic supplemental air carriers to operate "split charters"—charters of a plane by two eligible groups neither of which can itself fill the aircraft—in overseas and foreign air transportation. Though this court held that such Board action could be judicially challenged as beyond its statutory power, we resolved the issue on the merits in favor

*terman,"* we said, "presupposes lawfully exercised congressional authority in the Board's action, in the first instance, as an indispensable predicate, without which there is nothing Presidential action can approve." 121 U.S.App.D.C. at 123, 348 F.2d at 352.[14] The *Waterman* bar on judicial review was thereby effectively limited to challenges to the Board's judgment where such judgment was subject to Presidential approval. The bar would not, after *American Airlines,* extend to challenges to Board authority.[15]

It is primarily on this decision and on Pan American World Airways, Inc. v. C.A.B.,[16] a recent Second Circuit decision which follows *American Airlines* on its jurisdictional holding, that petitioners rely in arguing for direct review of Sudflug's permit in this court. But even if the Board's declination of jurisdiction over tour operators did exceed its statutory authority, it is by no means clear that there is direct review in this court. Both *American Airlines* and *Pan American World Airways* involved orders with respect to *citizen* air carriers subject to Presidential approval. Consequently, in those cases any putative limitation on direct Circuit Court review stems from the *Waterman* gloss on Section 1006, not from Section 1006 itself; for in *Waterman* non-reviewability is premised merely on Presidential approval, not on explicit statutory language. In finding *Waterman* inapplicable to the allegedly unauthorized Board action deemed reviewable in *American Airlines,* the court pointed out that:

"The deference *Waterman* accords to Presidential discretion in matters of national defense and foreign policy as

they bear on overseas air carriers has no relevance where, as here alleged, the President purports to approve a recommendation which the Board was powerless to make; if indeed the Board has no power, then as a legal reality there was nothing before the President." 121 U.S.App.D.C. at 124, 348 F.2d at 353.

But where a foreign air carrier is involved, the issue is not whether the reach of a statute should be extended beyond its apparent coverage because of considerations of national defense and foreign policy; rather it is whether an exception should be carved from the plain language of the statute itself. Certainly *American Airlines* and *Pan American World Airways* are not dispositive where this latter question is at issue. And in *British Overseas Airways Corp.,* which did involve the reviewability of an order with respect to a foreign air carrier, relying on the plain language of Section 1006 we said that there could be no direct review in this court "now or later." 113 U.S. App.D.C. 76, 304 F.2d 952.

III

■■ Despite the suggestion in *B.O. A.C.* that the Board's order might be reviewable in the District Court, that avenue of appeal is also not free from doubt. Only the Circuit Courts are given reviewing authority by the Act itself, and Section 1006 specifically excepts from review orders such as the one at issue here. Even where an administrative statute is silent with respect to review, it does not follow that a court of original jurisdiction may intervene. As the Supreme Court said in Estep v. United

of the Board's authority to provide for "split charters."

14. This view was first expressed by the Supreme Court's four-member minority in *Waterman,* which maintained that "Presidential approval cannot make valid invalid orders of the Board. His approval supplements rather than supersedes Board action. Only when the Board has acted within the limits of its authority has the basis been laid for is-

suance of certificates." 333 U.S. at 116, 68 S.Ct. at 438. The minority argued that review "restricted to the action of the Board" should not be precluded simply because of subsequent Presidential approval. *Ibid.*

15. For one commentator's prognosis of just what effect *American Airlines* will have on the *Waterman* doctrine, see Miller, *supra* Note 9.

16. 2 Cir., 380 F.2d 770 (1967).

494

States, 327 U.S. 114, 120, 66 S.Ct. 423, 426, 90 L.Ed. 567 (1946):

"Apart from constitutional requirements, the question whether judicial review will be provided where Congress is silent depends on the whole setting of the particular statute and the scheme of regulation which is adopted. Switchmen's Union [of North America] v. [National] Mediation Board, 320 U.S. 297, 301 [, 64 S.Ct. 95, 88 L.Ed. 61]. And except when the Constitution requires it, judicial review of administrative action may be granted or withheld as Congress chooses."

The Board argues that the "setting" and statutory scheme of the Federal Aviation Act demonstrate a congressional intent to immunize Presidentially approved orders with respect to foreign air carriers from judicial scrutiny in any court. Not only is the rationale of the congressionally imposed bar of Section 1006 as applicable to review by the District Court as it is to direct review here; other sections of the Act also imply congressional aversion to District Court review of such orders. Section 1007, 49 U. S.C. § 1487 (1964 ed.), confers jurisdiction on the District Court to entertain actions brought by "any party in interest" to enforce Section 401(a), which section requires United States flag carriers to hold certificates of public convenience and necessity issued by the Board. But Section 1007 contains no comparable grant of jurisdiction to en-

tertain suits to enforce Section 402 which deals with permit requirements of foreign air carriers, and in a recent District Court opinion, the court held that no such authority existed. Caribbean Atlantic Airlines v. Leeward Islands Air Transport, D.P.R., 269 F.Supp. 230 (1967).

The Board concedes that, if a constitutional interest of Trans World or Pan American was threatened, then these constitutional considerations would dictate that review be accorded by a court of original jurisdiction despite statutory indications to the contrary. *See* Estep v. United States, *supra*. But here, the Board argues, the petitioners' interest is merely that they be free from what is at best a marginal competitive impact.[17] While the interest might be sufficient to give petitioners standing under the Administrative Procedure Act, it does not necessarily confer standing to challenge administrative action in the District Court. As we said in Kansas City Power & Light Co. v. McKay, 96 U.S.App.D.C. 273, 282, 225 F.2d 924, 933, *cert. denied,* 350 U.S. 884, 76 S.Ct. 137, 100 L.Ed. 780 (1955), Section 10(b) of the Administrative Procedure Act "does not render competent a court which lacks jurisdiction on any other ground." It does not derogate from the role of courts in determining, " 'in the context of constitutional requirements and the particular statutory pattern, who is entitled to review.' " 96 U.S.App.D.C. at 281, 225

17. Though the impact of economic competition may be a sufficient interest to confer standing, freedom from competition is not a constitutionally protected interest that would give a court jurisdiction where Congress has decreed otherwise. *See, e. g.,* Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 137–144, 59 S.Ct. 366, 83 L.Ed. 543 (1939); Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 (1938); Law Motor Freight, Inc. v. C. A. B., 1 Cir., 364 F.2d 139 (1966), *cert. denied,* 387 U.S. 905, 87 S.Ct. 1683, 18 L.Ed. 2d 622 (1967). *See also* Texas State AFL-CIO v. Kennedy, 117 U.S.App.D.C. 343, 345, 330 F.2d 217, 219, *cert. denied,* 379 U.S. 826, 85 S.Ct. 54, 13 L.Ed.2d 36 (1964); Neisloss v. Bush, 110 U.S.

App.D.C. 396, 293 F.2d 873 (1961). Furthermore, as the hearing examiner pointed out, neither of the petitioners adduced any "estimate of the diversion of revenues, if any, that might result from Sudflug's contemplated operations." Nor did they adduce evidence that "would permit a determination of the extent of their revenues derived from German originating traffic destined to the United States, much less the percentage of such traffic that might represent tour business." The Board agreed with the examiner's findings on this issue and concluded that "[t]here is no evidence establishing that such operations [Sudflug's] * * * will have any significant adverse effect upon any U. S. scheduled carrier * * *."

F.2d at 932. Thus the obstacles in the way of review of the Board order in this case via the District Court are almost as formidable as those in the way of direct review.[18]

## IV

 We come then to our disposition which avoids the jurisdiction to review problem. We uphold the Board's declination to exercise its jurisdiction as to foreign tour operators. Candor requires us to admit that there is no express statutory authority for the Board's declination of jurisdiction, and that literally read Section 402 seems to authorize the Board to allow even an indirect foreign air carrier, such as a tour operator, to engage in foreign air transportation only if, following a hearing, the Board has

issued the carrier a permit.[19] But Section 402 does not explicitly direct the Board to do more than pass on properly filed applications and this it has done with respect to Sudflug's, the only application before it. As the Board so convincingly demonstrated in its opinion to the President, attempted regulation in this case and perhaps others involving indirect foreign air carriers [20] would not only fail to advance the purposes of the Act, but would tend to frustrate the policies of the Board and the President with respect to American supplementals flying inclusive tour charters abroad.[21] The Board's interpretation of the statute as granting it discretionary rather than mandatory jurisdiction over indirect foreign air carriers[22] is consistent with its

18. Moreover, in view of our decision that the Board does have the authority to decline jurisdiction over the German tour operators, the writ of mandamus sought by petitioners in the District Court is not only unavailable, but also inappropriate. Mandamus lies only to compel performance of ministerial acts, while in our view the Board's challenged authority here is discretionary.

19. See Notes 5 and 6, *supra*.

20. In American Airlines v. C. A. B., 7 Cir., 178 F.2d 903 (1949), the court emphasized that when Congress passed the Civil Aeronautics Act, predecessor of the Federal Aviation Act, it was principally concerned with direct, not indirect, air carriers.

21. The Board has said that the § 402 criterion of public interest "is to be read with regard to those conceptions of reciprocity and fair dealing that we, as a nation, should seek to apply in our dealings with other states and expect of them in their dealings with us." Linea Aerea Taca de Venezuela, C.A., Air Carrier Permits, 7 C.A.B. 317, 322 (1946). *See also* 49 U.S.C. § 1502 (1964 ed.).

22. And the Board's enforcement authority under § 1002, 49 U.S.C. § 1482 (1964 ed.), which petitioners have not apparently asked the Board to invoke against the tour operators, has been definitively interpreted as discretionary. While § 1002 permits any person to file with the Board a complaint "with respect to anything done or omitted to be done by any person in contravention of any provisions of this chapter," it also provides that "[w]henever the * * * Board is of the opin-

ion that any complaint does not state facts which warrant an investigation or action, such complaint may be dismissed without hearing." And this court has said that though this discretion is subject to review, "the Board does have a discretionary power to dismiss a complaint which states reasonable grounds for believing that the Act has been or is being violated when it reasonably concludes that it would be in the public interest to do so * * *." Flight Engineers International Ass'n, EAL Chapter v. C. A. B., 118 U.S.App. D.C. 112, 114, 332 F.2d 312, 314 (1964). *See also* Flying Tiger Line, Inc. v. C. A. B., 121 U.S.App.D.C. 332, 350 F.2d 462 (1965), *cert. denied*, 385 U.S. 945, 87 S. Ct. 316, 17 L.Ed.2d 224 (1966) ; Nebraska Department of Aeronautics v. C. A. B., 8 Cir., 298 F.2d 286 (1962) ; 1 K. C. DAVIS, ADMINISTRATIVE LAW TREATISE § 4.07, p. 260 (1958): "Mandatory jurisdiction like that of the ICC is conferred by some later statutes, * * * but in other instances the administrative jurisdiction is discretionary, as in the Civil Aeronautics Act." Consequently, while petitioners can file a complaint against the tour operators for conducting their activities without a permit, the writ of mandamus sought by petitioners in the District Court would not lie to compel the Board to take any action on the complaint.

But directly at issue here is not the Board's § 1002 investigative and enforcement powers in dealing with third-party violators of the Act. Petitioners' contention is that the Board does not have similar power to grant an exemption to the tour operators from the hearing and per-

administrative precedents[23] and is a reasonable and hence a permissible one justified by the incongruent result which this construction avoids.[24]

The Board feared as early as 1955 that comprehensive regulation over direct foreign air carriers contemplated by the Act might become "unwieldly and burdensome" when applied to indirect foreign carriers. C.A.B. Order E–9179, adopted May 3, 1955 (initiating the International Airfreight Forwarder Investigation). And the Board has consistently interpreted the statute as giving it discretion to decline jurisdiction over them.[25] Though there is no express statutory authority for such declination of jurisdiction, we will not upset the agency's interpretation of the statute it administers, particularly where, as here, the relevant United States interests are adequately secured through regulation of the direct foreign air carriers.

▆▆▆▆ The general principle of judicial deference to administrative interpretation applies in full strength where such interpretation involves resolution of jurisdictional questions. What we said in Philadelphia Television Broad-

casting Co. v. F.C.C., 123 U.S.App.D.C. 298, 300, 359 F.2d 282, 284 (1966), is appropriate here:

"In a statutory scheme in which Congress has given an agency various bases of jurisdiction and various tools with which to protect the public interest, the agency is entitled to some leeway in choosing which jurisdictional base and which regulatory tools will be most effective in advancing the Congressional objective."

See also Classified Directory Subscribers Ass'n v. Public Service Com'n, 127 U.S. App.D.C. 315, 383 F.2d 510 (1967). We think that in an area where legislative directives and constitutional considerations combine to circumscribe, if not eliminate altogether, the judiciary's reviewing role, extraordinary deference to the decisions of the Board and the President is required. Accordingly, we find that the Board's declination of jurisdiction over German tour operators did not exceed its statutory power. Its judgment in declining to exercise this discretionary jurisdiction, if reviewable at all,[26] seems to us eminently reasonable.

Affirmed.

---

mit requirements of § 402 and that in declining jurisdiction over them it is the Board, not a third party, who is violating the Act. As indicated, however, in our view the Board has not contravened the Act in declining to exercise § 402 jurisdiction over indirect foreign air carriers.

23. See Note 25, infra.

24. See, e. g., United States v. American Trucking Ass'ns, 310 U.S. 534, 542, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) ; American Dredging Co. v. Cochrane, 89 U.S. App.D.C. 88, 92, 190 F.2d 106, 110 (1951) ; North American Utility Securities Corp. v. Posen, 2 Cir., 176 F.2d 194 (1949). See also American Airlines v. C. A. B., 7 Cir., 178 F.2d 903, 909 (1949), where, though the C.A.B. did not "follow the literal language of the [Act]," the court nevertheless upheld its order because it felt that "the interpretation of the statute by the board in order to avoid incongruous result and in order to effectuate the intent of Congress was proper * * *."

25. International Airfreight Forwarder Investigation, 27 C.A.B. 658, 720–722 (1958), reaffirming its decision to decline

§ 402 jurisdiction over the inbound operations of foreign indirect air carriers of property; Caledonian Airways Temporary Inclusive Tour Authority Investigation, Order E–22978, approved by the President on December 5, 1965, declining jurisdiction over the inbound operations of British tour operators. While the agency's construction of its statute "is not binding on the courts, that construction is entitled to great weight. Petitioners must shoulder the burden of persuading us that the body charged by Congress with the day to day administration of the * * * Act has deviated from or ignored an ascertainable legislative intention." City of Los Angeles v. F. M. C., 128 U.S.App.D.C. 156, 159, 385 F.2d 678, 681 (1967); see, e. g., Udall v. Tallman, 380 U.S. 1, 16–18, 85 S.Ct. 792, 13 L.Ed. 2d 616 (1965).

26. Even after American Airlines (1965), it is doubtful that this court can entertain challenges to the Board's judgment—as opposed to its authority—if such judgment is subject to and given Presidential approval.